UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HEATHER L. MACK | No. 17 CR 518<br><br>Judge Matthew F. Kennelly |

# GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE ON BOND

The UNITED STATES OF AMERICA, by and through the undersigned attorneys, respectfully submits this response in opposition to defendant Heather L. Mack's Motion for Bond/Release from Custody (Dkt. 69).

## I. FACTUAL AND PROCEDURAL BACKGROUND

On or about July 26, 2017, a grand jury sitting in the Northern District of Illinois returned a sealed indictment charging defendant Heather L. Mack with Conspiracy to Commit Murder, in violation of Title 18, United States Code, Section 956(a)(1) and (2)(A)(Count 1); Conspiracy to Commit Foreign Murder of United States National, in violation of Title 18, United States Code, Section 1117 (Count 2); and Obstruction of Justice, in violation of Title 18, United States Code, Section 1512(c)(1) and (2) (Count 3). *See* Dkt. 1.

The indictment alleges that Mack entered into a conspiracy with co-defendant Tommy Schaefer (Schaefer) to kill her mother, Sheila Von Wiese, while Mack and Von Wiese were on vacation in Bali, Indonesia. According to the indictment, the defendant and her mother traveled to Bali on or about August 2, 2014. As part of the

planned murder, the defendant used her mother's credit card to purchase a $12,000 airline ticket for Schaefer to fly from Chicago to Bali. Schaefer arrived in Bali just after midnight on August 12, 2014. Hours later, the defendant and Schaefer killed Von Wiese inside her hotel room.

Evidence recovered after the murder included dozens of text messages between Mack and Schaefer discussing how and when to kill the defendant's mother.[1] After they killed Von Wiese, the defendant and Schaefer tried to conceal the murder by getting rid of the bloody linens and items of clothing they wore during the murder. They also placed Von Wiese' body into a suitcase and wrapped with bed sheet. Mack and Schaefer then used a luggage trolley to transport the suitcase to the hotel taxi stand. After loading the suitcase into the trunk of a taxi, Mack and Schaefer tried to leave the hotel. After interacting with the taxi driver, Mack and Schaefer abandoned the suitcase in the trunk of the taxi and fled to another hotel, where they were arrested by Indonesian law enforcement the next day, on or about August 13, 2014.

Mack and Schaefer were prosecuted in Indonesia for crimes related to the murder of Von Wiese. In 2015, Mack was convicted of being an accessory to murder and sentenced to 10 years in prison. Schaefer was convicted of murder and sentenced to 18 years in prison. Schaefer remains incarcerated in Indonesia.

At the time the sealed indictment was returned in this district, defendant was serving her sentence in Indonesia. While in custody in Indonesia, the defendant had

---

[1] Evidence proffered in this response has been previously disclosed to defense counsel in discovery or is based on information contained in Pretrial Services reports.

access to social media and publicly broadcast videos of herself discussing the murder. She also provided interviews to media outlets about the murder, portions of which are publicly available for viewing.[2]

In late October 2021, after Indonesian officials reduced Mack's sentence under applicable law, the defendant was released from custody in Indonesia and entered immigration custody. Mack, a U.S. citizen, had no lawful authority to remain in Indonesia after her release, and the U.S. Department of State issued an emergency passport to defendant, valid for one month only, to permit her return to the United States. Accordingly, upon her release from Indonesian custody, the defendant had no choice but to return to the United States. She arrived at O'Hare International Airport on November 3, 2021, and was arrested upon arrival. Defendant was arrested at the airport. The indictment was unsealed after her arrest. *See* Dkt. Nos. 17 and 18.

An initial appearance and arraignment were held on November 3, 2021 before District Judge Charles Norgle. Dkt. 20. A detention hearing was scheduled at the request of the defendant for November 10, 2021. *Id.* In anticipation of the hearing, Pretrial Services produced a report on November 9, 2021, recommending detention. Dkt. 23. At a hearing held on November 10, 2021, the defendant informed the court she would not contest detention. Dkt. 23. Defendant has been in custody since her arrest.

---

[2] For example, in a YouTube video posted on February 2, 2017, Mack took responsibility for the murder of Von Wiese. Additionally, Mack provided an October 2016 interview to a media outlet discussing the murder.

This case was reassigned on October 5, 2022, due to the retirement of Judge Norgle. Dkt. 59. On November 21, 2022, after a year in custody, the defendant filed a motion for release. Dkt. 69 ("Motion"). On November 30, 2022, Pretrial Services issued a supplemental report once again recommending detention.

II. ANALYSIS

### a. There is a Presumption of Detention in this Case, Which Defendant Has Not Rebutted

The Bail Reform Act, Title 18, United States Code, Section 3142, establishes a set of factors that the Court may consider in its detention determination, including the nature and circumstances of the offense charged, the weight of the evidence against the defendant, and the history and characteristics of the defendant. 18 U.S.C. § 3142(g). The Federal Rules of Evidence do not apply at a detention hearing. Fed.R.Evid. 1101(d)(3); 18 U.S.C. § 3142(f). With respect to risk of flight, the government bears the burden of proof beyond a preponderance of the evidence; with respect to danger to the community, the government bears the burden of proof by clear and convincing evidence. *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985); *United States v. Daniels*, 772 F.2d 382, 383 (7th Cir. 1985). A finding of either danger to the community or a flight risk is sufficient to detain a defendant awaiting trial; a court need not find both to detain a defendant under the Bail Reform Act. *Id.*

Here, defendant has been charged in Count One of the indictment with conspiracy to murder, kidnap or maim abroad in violation of Title 18, United States Code, Section 956(a), and therefore a rebuttable presumption arises that no condition or combination of conditions can be imposed that will reasonably assure appearance

4

of the defendant as required *and* the safety the community. *See* 18 U.S.C. §§ 3142(e)(3)(B)&(C).

The presumption then shifts the burden of production going forward (but not the burden of persuasion) onto the defendant to come forward with some evidence that if released he will not flee or endanger the community. *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985). Even if the defendant rebuts it, the presumption remains in the case as an evidentiary finding militating against release. *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

### b. The Nature and Circumstances of the Offense Counsel Against Release

The circumstances of the offense are premediated, violent, and disturbing and weigh heavily in favor of detention.

Sheila Von Wiese, 62, was brutally bludgeoned to death by Mack and Schaefer. According to the autopsy report, Von Wiese was repeatedly beaten on her head and face, causing her nasal bone to fracture and obstruct her airway. An autopsy showed signs of asphyxiation. Von Wiese suffered over a dozen blows to head, including open wounds above the eyes, forehead, and nasal cavity. The autopsy also reported defensive wounds to the right and left lower arms.

Mack sought to have her mother murdered for months. According to social media messages, Mack asked Schaefer in February 2014, six months before the murder, to find someone to kill her mother in return for a payment of $50,000. She

also asked Schaefer's cousin, Ryan Bibbs, if he knew anyone that was willing to kill her mother for money.[3]

On July 25, 2014, Schaefer sent Bibbs a series of text messages, seeking to assure Bibbs that the conspiracy to kill Von Wiese was moving forward, and expressing excitement about the money Schaefer would receive after Von Wiese was murdered. Schaefer wrote, "she's really tryna knock her mom off … remember when I told you the first time … bucko bucks … yo mind bouta be blown … bang bang … we on in a month … I'm too geeked … when I say pack yo bags it's for real this time … I'm telling you g you can start celebrating …."[4] On August 2, 2014, the day Mack and Von Wiese departed for Bali, Schaefer sent Mack a message noting that "[he] can't wait to be rich . . . I'm like thinking of lavish lifestyles … and nothing rules the world like money."

Mack encouraged Schaefer's belief that he was about to receive a financial windfall in return for participating in the murder of Von Wiese. For example, in a text message on August 10, 2014, Mack texted Schaefer that he "just gained 11 million dollars."

As noted above, Mack purchased Schaefer's airline ticket to Bali. However, the plan also required secrecy in order to prevent Von Wiese from learning that Schaefer was arriving in Bali. For example, in messages to Schaefer on August 10,

---

[3] Bibbs was charged separately and is currently serving a nine-year prison sentence for aiding and abetting the conspiracy to murder Von Wiese. *United States v. Bibbs*, 15 CR 578, dkt. 105 (Judgment).
[4] Text messages quoted in this response include errors in the original messages. The government's interpretation of certain words or phrases is provided in brackets.

6

2014, Mack instructed Schaefer, "say youre coming to see your friend heather at the Str egis when the guy picks you up … [w]e gotta talk in person … [a]nd ill meet you in the lobby. Dont say anything about my mom just say you're visiting heather if they ask." Hotel records confirm that Mack booked Schaefer's room under her name, using Von Wiese's credit card.

The text messages reveal, in chilling detail, the back and forth between Mack and Schaefer as they waited for the right moment to murder Von Wiese. Some of these texts included:[5]

> Schaefer: wait till it's a heavy snore.
>
> Mack: literally cant wait.
>
> Mack: I'm so scared not to do it.
>
> Schaefer: don't rush.
>
> Schaefer: cant we sfcate [suffocate] her together … put your hand over her moutg [mouth].
>
> Schaefer: let me just creep up and wack her … once I do it she was drunk and slipped and fell.
>
> Mack: okay
>
> Mack: just knock her out.
>
> Schaefer: … get her [Von Wiese] weak
>
> Schafer: I promise you heather … Relax … Ur Bonnie do it [you're Bonnie, in reference to Bonnie and Clyde].
>
> Mack: … I need you in here too.

---

[5] Excerpts from the exchange between Mack and Schafer before Von Wiese' murder are provided. Not all of the text messages in this conversation are listed.

7

> Schaefer: can you wack her in the head with a big ass pole … trust me [w]e got nothin to lose right now.
>
> Mack: i need your help … just put your hand over her and i could grab her body.
>
> Schaefer: [f]uck … must knock her out … I'm finding something right now … I'll do it.
>
> Mack: [o]kay.

The text also included a photo of a fruit bowl stand from the hotel, which had a metal handle. Schaefer brought the metal stand with him to Mack's hotel room. Additional text messages between Schaefer and Mack included:

> Schaefer: come in the hallway right now … I'm gonna slow af [as fuck] and do it.
>
> Mack: slow [] quiet.
>
> Mack: too dangerous to not do it … you have to come in ….
>
> Mack: just do what you can ill need you[r] help ... dont let her yell … [g]ive her a minute to be off guard.
>
> Schaefer: let me hit her first.

After the murder, Mack and Schaefer attempted to clean up the crime scene. Mack and Schafer took bed sheets from Schaefer's room and swapped out the bloody bedsheets from Von Wiese's bed. Mack and Schaefer stuffed many of the bloody sheets and pillows into suitcases and inside a laundry bag, which they placed inside a fire extinguisher closet located in the hotel hallway. Mack and Schaefer are also visible on hotel video a using a luggage trolly to wheel the suitcase through the hotel and out to a taxi stand. The taxi driver and hotel staff became suspicious. At one point, ask Mack was adjusting the suitcase in the back of the taxi, the hotel staff

commented that the stains on the sheets covering the suitcase looked like blood. After the taxi driver refused the fare, Mack and Schafer abandoned the suitcase and fled the hotel. Indonesian authorities later recovered Von Wiese's body from this suitcase. After fleeing the hotel, Mack and Schaefer eventually checked into another nearby hotel where they were arrested by Indonesian police the next morning.

As Mack and Schaefer awaited trial in Indonesia, Schaefer's relative visited Indonesia and met with Schaefer and with Mack. During the visit, Mack and Schaefer explained that Schaefer struck Von Wiese with the fruit bowl and that Mack covered Von Wiese's mouth with her hand. In a subsequent recorded call, the relative asked Mack why Mack covered Von Wiese's mouth after Schaefer hit Von Wiese with the fruit bowl. Mack explained that Von Wiese had to die because Schaefer would have been in even bigger trouble if Von Wiese survived. These and other admissions indicate that Mack didn't just conspire to kill her mother, but was directly involved in her mother's murder.

Von Wiese' murder was the last violent act in a series of attacks by the defendant. Police repeatedly were called to the Von Wiese residence to address Mack's violent behavior. For example, in October 2011, Mack bit her mother on the arm during a disagreement. As a result of this incident, Mack was placed on juvenile supervision. In January 2013, while on supervision, Mack was arrested for assaulting Von Wiese. Notably, at the time of Mack's January 2013 arrest, Von Wiese expressed to the police that she was afraid that Mack was going to kill her. Von Wiese also indicated Mack had been hospitalized for psychiatric purposes after Mack hit

9

Von Weise, in November 2012. Additionally, around the time of the January 2013 arrest, police spoke with Mack's probation officer who confirmed that Mack was under supervision at the time of the arrest. Further, the probation officer told police that Mack was completely out of control and that the probation officer was afraid that Mack was going to kill her mother.

In sum, defendant planned to kill her mother. In doing so, she enticed her co-defendant with money; made travel arrangements for her co-defendant to travel to Bali to assist in the murder; communicated with him about when and how to kill her mother; and tried to hide the evidence, including the body. The murder came after years of abuse and physical attacks. Defendant should remain detained.

### c. The Weight of the Evidence is a Factor Against Release

The weight of the evidence implicating the defendant is overwhelming. The evidence includes, among other things: (1) social media messages indicating that the defendant offered Schaefer money to find someone to kill her mother; (2) text communications between Mack and Schaffer discussing how and when to carry out the murder; (3) video footage from the hotel showing the movements of Mack and Schaefer in the hours leading to the murder; (4) hotel and travel records showing that Mack fraudulently used her mother's credit card to purchase an airline ticket and hotel room in Bali for Schaefer; (5) video footage of Mack and Schaefer at the taxi stand with the suitcase containing the victim's body inside the trunk of the taxi; (6) testimony from a medical examiner who examined Von Wiese; and (7) admissions made by the defendant implicating herself in her mother's murder.

It is axiomatic that defendant's crimes are serious and may lead to many years or even life in prison if convicted. *See, e.g.* 18 U.S.C. § 956(a)(2)(A) (permitting a maximum term of imprisonment for any term of years or life for conspiracy to murder). Based on the government's guidelines calculation, the advisory guidelines range is life in prison. Therefore, the weight of the evidence supports defendant's continued detention.

### d. History and Characteristics of the Defendant

Defendant has a history of violence and inability to comply with court orders. The November 2021 report submitted by Pretrial Services details Mack's criminal history. As detailed in the report and as described above, the defendant has been arrested on multiple occasions for domestic battery and fraudulent use of her mother's credit card, including while on probation.

The November 2021 report also indicates defendant has a history of mental health issues, which further counsel against release. The issues are corroborated by the police reports which note that the defendant was hospitalized on various occasions as a result of the attacks on her mother and was on medication for anxiety and depression. The police reports also note that Mack suffered from anger issues and was receiving mental health treatment.

In addition to the reports, Von Wiese herself expressed concerns about the defendant's mental state, Mack's refusal to get help, and propensity for violence. For example, in an email from July 3, 2014, about a month before she was killed, Von Wiese confided to a family member, "[Mack] told me today that she would kill me and

11

then others she 'hates' before killing herself if I try to get her admitted to a psych ward …. She is truly out of her mind …. I am more worried than ever."

Finally, defendant's argument that she was only a danger to her mother, who is dead, is incorrect. (Motion, para. 9.) The email referenced in the paragraph above indicates that Mack's mother, in a candid email to a family member, expressed concern that Mack had threatened "others [Mack] 'hates.'" As described above, the defendant solves her perceived problems with violence, threats of violence, and by enticing or manipulating others to commit violence on her behalf. She has a years-long history of violence and was willing to pay for, and participate in, the death of her closest living relative. Further, her mental health history described in the Pretrial Services reports counsels against release. She should remain detained.

### i. Defendant Has No Ties to the District, and the Proposed Custodian is Unsuitable

With the murder of Von Wiese, the defendant lost her strongest family tie to the Northern District of Illinois.[6] The defendant has been outside of the district for almost her entire adult life. She has no employment or place to live in the district, and the defendant's Motion does not suggest otherwise. Instead, the defendant's Motion proposes that she be released to live with a third-party custodian who lives in California. (Motion, para. 7).[7]

---

[6] Defendant has a minor child who, according to recent media reporting, now lives out of state with a guardian, and in a different state than defendant's proposed custodian.

[7] The parties and Pretrial Services are aware of the identity of the proposed custodian. This person has yet to appear before the Court in this matter and is not

12

The third-party custodian is not suitable. First, the proposed custodian lives in California, far away from the Northern District of Illinois. The defendant would not be amenable to supervision by this Court. The defendant's claim that she "has no means to travel" (Motion, para. 6) and her desire live in California, which would necessitate travel for court, are incompatible. Second, there is no evidence that the proposed custodian, a family friend, has any influence or ability to ensure defendant's appearance in this District. The proposed custodian reported to Pretrial Services in November 2021 and again in November 2022, that she was unwilling to post fund or property towards bond if ordered by the Court—that is a very good indication that the proposed custodian cannot confidently ensure the defendant's compliance with any set of release conditions. As far as the government is aware, the defendant and the proposed custodian have never lived in the same city, let alone the same household, indicating that the proposed custodian has had minimal in-person contact with the defendant. Further, Pretrial Services was aware of the proposed custodian in November 2021 and November 2022 and nonetheless recommended detention twice.

### ii. Did Not Voluntarily Agree to Return to the United States to Face the Instant Charges

The defendant did not, as her Motion claims, "voluntarily agree[] to return to the United States to face the charges at issue in the present case." The defendant's filing leaves the inaccurate impression that the defendant's return to the United

---

otherwise named in a public filing related to this case, including defendant's motion for release.

States was voluntary and done with the intention of facing the current charges. This assertion is incorrect. As described above, the indictment in this case remained sealed until defendant's arrest upon her return to the United States on November 3, 2021. Defendant was not informed of the sealed indictment either before or after her released from custody in Indonesia. Further, defendant is a citizen of the United States and not a citizen of Indonesia. Upon her release from prison, Indonesian authorities transferred defendant to immigration custody until the State Department issued her an emergency passport, valid for 30 days, to return. She had no option but to return to the United States.

### III. Pretrial Services Twice Concluded That There is No Condition or Combination of Conditions That Would Reasonably Assure the Safety of the Community.

In November 2021, in anticipation of a detention hearing, Pretrial Services issued a bail report recommending detention. The defendant's Motion does not address the recommendation, nor does the Motion suggest any changed circumstances since November 2021 that would merit a different recommendation. Indeed, the defendant even proposes the same custodian offered in November 2021, with whom Pretrial Services spoke in November 2021 and nonetheless recommended detention. In a supplemental report in November 2022, Pretrial Services reached the same conclusion: the defendant should be detained.

## IV. Conclusion

The government agrees with Pretrial Service's recommendation that the defendant should be detained. For the foregoing reasons, the Court should deny defendant's motion for release and order her continued detention pending trial.

Respectfully submitted.

| | |
|---|---|
| JOHN R. LAUSCH, JR.<br>United States Attorney | KENNETH A. POLITE, JR.<br>Assistant Attorney General<br>Criminal Division |
| By:    _/s/ Ann Marie E. Ursini_<br>ANN MARIE E. URSINI<br>Assistant United States Attorney<br>219 S. Dearborn Street, Rm. 500<br>Chicago, Illinois 60604 | By:    _/s/ Frank G. Rangoussis_<br>FRANK G. RANGOUSSIS<br>Trial Attorney<br>Human Rights and Special<br>Prosecutions Section<br>1301 New York Avenue, N.W.,<br>Rm. 1215<br>Washington, D.C. 20530 |