UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 17 CR 518 |
| v. | |
| HEATHER L. MACK | Honorable Matthew F. Kennelly |

**GOVERNMENT'S MOTION TO ADMIT EVIDENCE
PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2)(e)**

The UNITED STATES OF AMERICA, by and through the undersigned attorneys, respectfully moves *in limine* to admit certain statements against defendant HEATHER L. MACK, pursuant to Federal Rules of Evidence 104(a) and 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I.      INTRODUCTION

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the charged conspiracy, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *Santiago*, 582 F.2d at 1130-31, and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris*, 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all of the government's evidence that would establish the existence of the charged conspiracies (namely, the agreement between defendant and Tommy Schaefer to kill Sheila Von Wiese) or all of the coconspirator statements that were made in furtherance of the charged conspiracies. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the conspiracies described in Counts One and Two, and the participation of the coconspirators within those conspiracies. As a

result, this submission does not list all of the government's evidence and witnesses, nor does it provide all of the evidence that will be presented by identified witnesses. Finally, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

## II.    OVERVIEW OF THE CHARGED SCHEME

On or about July 26, 2017, a grand jury sitting in the Northern District of Illinois returned an indictment charging defendant Heather L. Mack ("Mack") with conspiracy to commit murder, in violation of Title 18, United States Code, Section 956(a)(1) and (2)(A) (Count One); conspiracy to commit foreign murder of United States national, in violation of Title 18, United States Code, Section 1117 (Count Two); and obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(1) and (2) (Count Three).  *See* Dkt. 1.

As alleged in both Count One and Count Two of the indictment, beginning no later than on or about August 2, 2014, and continuing through on or about August 12, 2014, defendants Mack and Schaefer conspired together to kill Mack's mother, Shelia Von Wiese ("Von Weise") while Mack and Von Wiese were vacationing in Indonesia.  The conspiracy resulted in the murder of Von Wiese in Bali, Indonesia, on August 12, 2014.

## III.    GOVERNING LAW

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements

were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

### A. Existence of, and Membership in, the Conspiracy

In accord with *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), this Court must determine whether statements by the defendant's coconspirators will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination, this Court must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy …." *Id*. at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendant and declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, e.g., United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

---

[1] No Sixth Amendment confrontation issues arise by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant because they are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006), and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid.801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (*en banc*).

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and the defendants' participation in it, *United States v. Bourjaily*, 483 U.S. 171, 178, 180 (1987); *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).

The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted. Accordingly, statements by coconspirators may be admitted against a defendant when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant was out of cocaine was not hearsay because it showed membership in conspiracy); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988)

(statements had non-hearsay value to establish knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set scope of anticipated conspiracy).

There is no requirement, under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy, such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator. *Longstreet,* 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

### B.  "In Furtherance of" the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea*, 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id*. at 937 (quotations and citations omitted). That statements were made

6

to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630, at *2-3 (N.D. Ill. 2004) (collecting cases).  In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement.  *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted); *see also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002).  These include statements made:

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);

- to prompt the listener to act in a manner that facilitates the carrying out of the conspiracy *United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997);

- to identify other members of the conspiracy and their roles, *Alviar*, 573 F.3d at 545;

- to plan or review a co-conspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- as an assurance that a co-conspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro*, 877 F.2d 1341, 1343-44 (7th Cir. 1989); *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a goal of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from co-conspirators, *United States v. Prieto*, 549 F.3d 513, 524 (7th Cir. 2008);

- to "describe[] the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992); and

- to attempt to recruit new members into the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all co-conspirators. *Beeson v. United States*, 90 F.2d 720, 722 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera*, 136 Fed. App'x 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

### C. Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy are independently admissible and do not require a Rule 801(d)(2)(E) analysis.

#### 1. A Defendant's Own Statements

A court may consider all nonprivileged evidence in determining whether defendant's own admissions are relevant to establish the factual predicates for the admission of coconspirator statements against her. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997). Many statements described herein and sought to be admitted against the defendant are independently admissible and do not require a Rule 801(d)(2)(E) analysis. A defendant's own statements, for example, are admissible against her pursuant to Federal Rule of Evidence 801(d)(2)(A), without reliance on the coconspirator-statement rule. *See United States v. Maholias*, 985 F.2d 869, 877

(7th Cir. 1993); Fed. R. Ev. 801(d)(2)(A) (a "statement" is not hearsay if "[t]he statement is offered against a party and is … the party's own statement, in either an individual or a representative capacity."). Additionally, a defendant's own statements are relevant to the question of whether a conspiracy existed for the purpose of for the admission of coconspirator statements against the defendant for purposes of Rule 801(d)(2)(E). *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997); *United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987).

Moreover, statements during a conversation with a defendant that are offered by the government to provide context for a defendant's statements are, as a general matter, admissible as non-hearsay. For example, in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the Seventh Circuit addressed the district court's introduction of a confidential informant's recorded statements to the defendant. The Court held that the challenged statements were non-hearsay because they were offered not for their truth but to put the defendant's "own words in context and to help the jury make sense out of his reaction to what [the informant] said and did." *Id.* at 580 (defendant's responses "would have been unintelligible without the context provided by [the informant's] statements").

### 2. Non-Hearsay Statements

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. A statement that is incapable of verification—such as a suggestion, question, offer, demand, or order—does not constitute hearsay because it "do[es] not make any truth claims." *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999); *United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985) (orders or suggestions not hearsay). This is because a "statement" is

defined as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a).

Finally, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Accordingly, statements by alleged coconspirators may be admitted against a defendant when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

### 3. Statements Against Penal Interest

Under Federal Rule of Evidence 804(b)(3), a hearsay statement is admissible if (1) the declarant is unavailable; (2) the statement was against the declarant's penal interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *See United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011). When determining whether a statement is against penal interest, each portion of a proffered out-of-court statement is examined to determine whether it subjected the declarant to criminal liability. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). A statement may satisfy this requirement if it would be probative at trial against the declarant. *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995). Applying this standard, the Seventh Circuit has held that a declarant's inculpatory statements made to friends and acquaintances about crimes committed by the declarant and his associates are admissible. *See, e.g. United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that a jailhouse conversation between two codefendants which incriminated a third codefendant but was

also inculpatory of the first two co-defendants was admissible against the third codefendant); *United States v. Curry*, 977 F.2d 1042, 1056 (7th Cir. 1992) (affirming the district court's decision to allow a co-defendant's inculpatory statement which also incriminated the defendant in because it was not made in an attempt to curry favor with law enforcement, but was made to an acquaintance).

Such statements against penal interest are admissible against non-declarant defendants. *See United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir.) *cert. denied sub nom. Sarno v. United States*, 135 S. Ct. 382 (2014) and *cert. denied sub nom. Polchan v. United States*, 135 S. Ct. 383 (2014); *United States v. Watson*, 525 F.3d 583, 587-88 (7th Cir. 2008); *United States v. Hamilton*, 19 F.3d 350, 356 (7th Cir. 1994). *See also United States v. Smalls*, 605 F.3d 765, 773-81 (10th Cir. 2010).

### 4. Co-Conspirator Statements After *Crawford*

Only "testimonial" statements implicate the Confrontation Clause, *Crawford v. Washington*, 541 U.S. 36 (2004), and a statement made in furtherance of a conspiracy is not a testimonial statement. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (rejecting confrontation clause claim as to introduction of coconspirator statements because such statements are not testimonial); *United States v. Hargrove*, 508 F.3d 445, 448 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial). Further, even if a hearsay statement does not qualify for admission under Rule 801(d)(2)(E), or any other hearsay exception, that fact alone would not create a Confrontation Clause issue because only testimonial statements implicate the right to confront a witness. *Crawford,* 541 U.S. at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as . . . would an approach that exempted such statements from Confrontation

Clause scrutiny altogether."); *see also Volpendesto*, 746 F.3d at 289 ("[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes.").

## IV.   THE EVIDENCE REGARDING THE EXISTENCE OF THE CHARGED SCHEME AND THE DEFENDANT'S PARTICIPATION IN THE SCHEME

At trial, the government's evidence will establish that the defendant conspired with co-defendant Shaefer to kill defendant's mother.  As set forth below, the evidence proving the existence of the scheme is strong and meets the preponderance of the evidence standard applicable at this stage of the proceedings.[2]  The evidence of the scheme includes, among other things, (1) voluminous electronic communications between Mack and Schaefer discussing Schaefer's travel to Bali and their plan to kill Von Weise; (2) electronic communications between Schaefer and a former roommate days before the murder indicating that Schaefer believed he would be wealthy soon; (3) electronic communications between Schaefer and Schaefer's cousin, Ryan Bibbs, reflecting Schaefer's expectation of becoming wealthy, as well as discussions of how to kill Von Weise and avoid getting caught; (4) other electronic communications, travel records, video, business records, and other evidence of acts in furtherance of the conspiracy; (5) evidence from the St. Regis hotel indicating that Mack and Schaefer disposed of blood soaked sheets and pillows; (6) camera footage of Mack and Schaefer transporting a suitcase containing the victim's body; (6) video of Mack stating she was going to go call her mother after taxi driver refused the fare because of the Mack's and Schaefer's behavior;  (7) evidence and testimony that Von Wiese' body was found inside the suitcase; (8) evidence of Mack's and Schaefer's relationship with each other and with Von Weise, that included a financial motive to kill her; and (9) evidence that Mack was

---

[2] The government is neither committing to introducing the evidence described herein at trial, nor limiting the government's case to the evidence described.

further motivated by a hatred of her mother (which includes evidence of past physical abuse of Von Wiese by Mack) and a desire to conceal the conspiracy and past acts of financial abuse that Mack and Schaefer committed against Von Wiese.[3]

### A. An Overview of the Conspiratorial Evidence

Shelia Von Wiese died on August 2, 2014, at the age of 62, at the St. Regis Hotel in Bali, Indonesia. The evidence in this case will prove that Von Wiese was murdered by Mack and Schaefer, who had conspired to murder Von Wiese. At the time, Mack was 18 years old, and Schaefer was 21 years old. Von Wiese' husband (Mack's father) pre-deceased Von Wiese. Von Wiese, Mack, and Schaefer were residents of the Northern District of Illinois.

Mack had multiple motives to kill her mother. In the months and years before the murder, Mack had a history of physically and financially abusing her mother, evidencing her hatred of Von Wiese. Mack and Schaefer also had a financial incentive – Mack had been stealing her mother's credit card information to make thousands of dollars of unauthorized purchases of goods and services, including electronics and other items for herself and Schaefer. For example, Mack and Schaefer used one of Von Wiese' credit cards to ship items, such as iPhones and a MacBook computer to "Jake Portugal" at Schaefer's address. Mack was also motivated to receive her mother's estate upon her death. For example, in search of Mack's residence conducted on or about August 21, 2014, law enforcement discovered, in a desk drawer in Mack's bedroom, a bank account statement that reflected a balance of over $1 million as of April 2014. Mack (an only child whose father pre-deceased her mother) believed she would inherit Von Wiese' assets upon Von Wiese' death. Schaefer profited from Mack's theft from Von Wiese on multiple occasions, and,

---

[3] The government has separately filed a motion to admit evidence of prior acts of physical and financial abuse under Federal Rule of Evidence 404(b).

therefore, Schaefer believed Mack would share Von Wiese' money with him after Von Wiese was dead. As described below, in the days and weeks before the murder, Schaefer exchanged electronic communications with multiple people, including a cousin, a former roommate, and Mack, about how he expected an impending financial windfall.

The following is a summary of some of the evidence the government expects to offer at trial relating to the conspiracy between Mack and Schaefer to kill Von Wiese.

**B. Mack's Multiple Solicitations to Kill Her Mother**

Mack solicited help killing her mother on at least two occasions in the six months before Von Wiese' death.

### a. Anticipated Testimony from M.M. Regarding Murder for Hire Solicitation

During a Facebook chat on February 4, 2014, Schaefer informed M.M. that Mack solicited him to assist Mack in killing her mother. Agents recovered these conversations from Schaefer's Facebook account. During a chat with M.M., Schaefer wrote, "please do not repeat this to anyone Heather does not deserve to have anything else bad happening to her[,] but she said that the one thing that would make her most happy is if her mom dies … [s]he asked me to find someone to kill her mom for 50k … she hates her mom so much … [a]nd can't wait to see her mom die."

According to M.M., M.M. and Schaefer never discussed Mack's request again. M.M. stated that M.M. last spoke to Schaefer about two weeks before Schaefer traveled to Indonesia, and that Schaefer stated that he was going on an all-expenses paid trip with Mack, but never mentioned that Von Weise would be on the trip.

### b. Anticipated Testimony from Bibbs Regarding Murder for Hire Solicitation

Ryan Bibbs, Schaefer's cousin, pleaded guilty in the Northern District of Illinois to aiding and abetting the Mack-Schaefer conspiracy to kill Von Wiese and is currently in custody serving

out his sentence (*United States v. Ryan Bibbs*, 15 CR 578). As described in this section and others below, Bibbs was the recipient of multiple communications from Schaefer updating Bibbs on the current status of the conspiracy to kill Von Wiese and its progress, as well as the purpose (acquisition of Von Wiese' money) and the methods of the criminal conspiracy.

Consistent with the factual basis of his plea agreement, Bibbs is expected to testify that Schaefer introduced Mack to Bibbs as Schaefer's girlfriend in 2014. Schaefer informed Bibbs at some point in 2014 that Mack wanted someone to kill Von Wiese and had offered Schaefer approximately $50,000 to do so. Further, Bibbs is expected to testify that, in late July or early August 2014, Mack and Bibbs had a conversation at Mack's home in Chicago. During this conversation, Mack told Bibbs that she wished her mother was dead, and asked Bibbs whether he knew someone that would kill her mother in exchange for money. During late July or early August 2014, Bibbs also had conversations with Schaefer, during which Schaefer acknowledged that Schaefer and Mack continued to discuss a plan to kill Von Wiese. Based on these conversations, Bibbs believed that Schaefer and Mack were serious about murdering Von Wiese, that Schaefer would receive a portion of Von Wiese' estate through Mack, and that Schaefer would use the money to provide for his family, including Bibbs.

### C. Schaefer Confirmed the Scheme to Bibbs in July 2014

Mack and Schaefer frequently used Von Wiese' credit cards to purchase electronics, clothing, and other items. In July 2014, Mack used one of Von Wiese' credit cards to book hotel stays at the Conrad, Waldorf Astoria, and other Chicago hotels. Von Wiese learned her credit card was being used at the Conrad Hotel and called the police. On or about July 23, 2014, Mack and Schaefer were arrested together at the Conrad Hotel in Chicago. Von Wiese declined to press charges and Mack and Schaefer were released the next day, on or about July 24, 2014.

15

On or about July 25, 214, the day after Schaefer and Mack were released from jail, Schaefer sent Bibbs a series of text messages which appeared to relate to the plan to murder of Von Wiese. Schaefer messaged Bibbs that Bibbs should start "celebrating" and "she's really tryna knock her mom off […] bucko bucks You mind about to be blown," which is believed to indicate that Mack and Schaefer solidified their plan to kill Von Wiese and that Schaefer expected to profit as a result of Von Wiese' death.  Shortly after, Schaefer sent a message to Bibbs including the phrase, "bang bang" and emojis depicting bags with dollar signs, and the phrase, "we on in a month."  A short time later, Schaefer sent more messages to Bibbs, including some stating: "I'm too geeked ... When I say pack yo bags it's for real this time ... I'm telling you g you can start celebrating ... Fo if someone robbed me right now I would asked them if they needed anything else." Bibbs is expected to testify that he understood Schaefer's messages to mean that Mack intended to kill Von Wiese and that Schaefer expected to receive proceeds from Von Wiese' estate as a result.

### D.  Mack and Schaefer Communicated About Mack's Mother While Mack Traveled With Von Wiese to Indonesia

Mack and Von Wiese left Chicago on August 2, 2014, to travel to Indonesia. As they were *en route*, Mack texted Schaefer multiple times, apparently referencing the plot to kill Von Wiese and the money they would make.

On or about August 2, 2014, the day Mack and Von Weise traveled to O'Hare Airport to leave Chicago for Bali, Schaefer texted Mack, "I can't wait to be rich…I seriously can't wait Im so geeked. I'm like thinking of lavish lifestyles [four diamond emoji] The world runs on money Its crazy af Like Money Nothing rules the world" to which Mack responded, "lmao…Eee Im in the [airport] lounge now…I love you…I'm about to board."

On or about August 3, 2014, Mack texted Schaefer, "Keep your head up…Trips going as planned baby…faith."  Schaefer responded that he had "a lot of faith in [his] girlfriend [Mack]

16

but" that Mack didn't know "that a lot of things aren't in her control." Mack responded with a series of text messages indicating, "I also know what is in my control…I know what makes people tick … the witch … I know what make her tick … I'm with her so much … I know her habbit … how she acts … what she does at certain times … its like breaking out of jail …. It takes several years of watching … I have been watching her routine … and I know what I do control …. Im sneaky … Im smart … and I watch…trust bonnie…Dn't make everyone else mistake and under estimate me." Schaefer agreed: "I like the confidence g. Once you think like you're a mastermind … You start understanding that you can control a lot more than you thought."

Several text messages between Mack and Schaefer indicate a romantic relationship between them, with Schaefer professing his love for Mack many times and indicating he would do anything for her, in the days before the murder. For example, on August 5, 2014, Schaefer texted, "I want my kids mother to be heather Mack…I do…G I would do anything for you I really would ….I'm your other half baby use me. I love you enough to do anything for my queen." In some of the conversations, such as in the August 3, 2014, text exchange quoted in the preceding paragraph, Mack and Schaefer refer to themselves as Bonnie and Clyde (a reference to the legendary outlaws Bonnie Parker and Clyde Barrow, who were romantically involved and engaged in a violent crime spree in the early 1930s).

Over several days, Mack and Schaefer exchanged numerous text messages about Schaefer's efforts to get a passport. The conversations indicate the need for a passport was "super urgent" (per Schaefer, on August 9, 2014).

On approximately August 8, 2014, Schaefer and Mack discussed Schaefer's travel arrangements to Bali by text message. Mack confirmed she would pay for the travel.

**E. Schaefer Communicated with M.S. to Get Funds for His International Travel and Offered to Forgive a Debt When He Returned, When He Would Have "Enough" Money to Do So**

On approximately August 9, 2014, in a text message to Mack, Schaefer asked Mack to provide him with money so that he could purchase food for the trip to Bali and buy a visa at the airport. Schaefer asked Mack, whether she had a way to wire him the money, but Mack indicated, "[y]es it is I dont (sic) now (sic) how to from here though." Schaefer texted, "I need money for food … I refuse to be stranded."

After some additional back forth, Schaefer came up with an idea on how to quickly obtain some cash for the long trip to Bali. In the early morning hours of August 10, 2014, Schaefer sent a Facebook message to M.S., Schaefer's former roommate, indicating that if M.S. could provide Schaefer with "$200 before 10AM today" then Schaefer would forgive other money M.S. and another roommate owed Schaefer (This came after other messages over a two-month period of Schaefer requesting repayment of $875 from M.S., claiming that he had lost a job, was "broke," and would go to the police to get the money back from M.S. and the other roommate.). However, as Schaefer worked to scrape together $100-200 to be able to buy food for the trip to Bali, Schaefer explained to M.S. that he had a "flight to Hong Kong" and would "have enough money" when he got back that he would forgive the rest of the amount he was owed. After the exchange, Schaefer texted Mack complaining he was "Gonna lose $500" by forgiving the rest of M.S.'s debt, but Mack assured Schaefer that, "You just gained 11 million dollars." Mack's statement is believed to be a reference to the money she told Schaefer that she would inherit as a result of Von Wiese' death and would share with him.

After Schaefer confirmed he had received the money from M.S. – again, after two months of demanding repayment of the full $875 debt – Schaefer messaged M.S., "You guys don't owe

me anything else thanks." Schaefer, who was unemployed, and had little money, was willing to forgive the remaining debt because Schaefer believed that once Von Wiese was dead, he was to receive a large sum of money, something that Mack repeated and encouraged. In other words, this series of text messages is probative of the charged conspiracies because it demonstrates that Schaefer expected Von Wiese to be dead before he returned to the United States, which would result in a financial windfall. In the conversation with M.S., Schaefer is effectuating part of the conspiracy by getting the resources he believed necessary to travel to Indonesia to help commit the murder. Schaefer also made an effort to conceal from M.S. his true travel destination and the nature of the trip by saying he was going to Hong Kong, and by not disclosing that he was traveling to Indonesia. The conversations leading to Schaefer's request for $200 from M.S. in exchange for forgiving the remainder of a significant debt are probative of Schaefer's intent and, therefore, of the existence of the charged conspiracies.

### F. While Waiting for His Flight to Indonesia, Schaefer Texted Bibbs About the Money Schaefer Expected to Have After the Trip

While Schaefer waited for his flight to depart O'Hare International Airport, he and Bibbs exchanged text messages. During these messages, Schaefer wrote to Bibbs that Bibbs should get a passport and get ready for an international vacation: "Get a passport […] So we can take off ... I come back for a week or two then it's off to Italy . . . On chief ... In about a year or so I'll have all that money ... Not all of it ... A couple mil prob." Bibbs is expected to testify that he understood Schaefer's messages to mean that Von Wiese' murder was imminent, that Schaefer expected to receive millions of dollars as a result of the murder, and that Schaefer would share some of this money with Bibbs.

19

### G. Von Wiese Was Afraid of Mack

Shortly after departing the United States, Von Wiese expressed concern for her personal safety while she was on the trip with Mack. On August 5, 2014, a few days after Mack's texts to Schaefer about being "smart" and "sneaky," as described above, Von Wiese sent an email to a friend stating, "I am afraid of her [Mack] and fear that I should not have come here at all … hoping that I have not made a big mistake here in Bali for 9 more days." The next day, on August 6, 2014, she wrote another friend, "I am always so worried about what Heather will do that I have had fitful sleep and found little relief when she is asleep." These email messages reflect that Von Wiese believed that she (Von Wiese) was in danger.

### H. Mack Bought Schaefer's Plane Ticket and a Hotel Room for One Night

Records from Orbitz, an online airline reservation application, indicate that Mack used her personal email address and one of Von Wiese' credit cards to book a flight for Schaefer on August 10, 2014, from Chicago O'Hare to Bali, costing $12,209.59. This is consistent with messages sent between Mack and Schaefer discussing the logistics of Schaefer's trip to Bali, including that fact that Mack purchased business class tickets for Schaefer .

In the days and weeks before Schaefer went to Bali, he and Mack exchanged numerous texts about Schaefer's efforts to get a passport in order to travel to Bali. Schaefer applied for a passport on July 10, 2014. According to his passport application, Schaefer indicated he was planning to travel to Indonesia. Mack and Schaefer texted about Schaefer's efforts to get his passport, that it was "urgent," and expressing frustration that it had not been expedited on their schedule.

Additionally, hotel records from the St. Regis Hotel in Bali, indicate that Mack booked hotel room 616 in her name for one night, August 11, 2014, for one guest. This is consistent with Mack's texts to Schaefer that she was getting him a hotel room separate for hers, for one night.

### I. Von Wiese Discovered Schaefer's Presence in Bali

Prior to Schaefer's arrival in Bali, Mack provided specific instructions on what Schaefer should do when he arrived. On or about August 10, 2014, using Facebook Messenger, Mack sent Schaefer screen shots of text messages she had sent to Schaefer earlier to be sure that Schaefer received and understood her messages about what to do after he arrived in Bali. Mack instructed Schaefer, "[] say youre coming to see your friend heather at the st regis when the guy picks you up … [w]e gotta talk in person … [a]nd ill meet you in the lobby. Dont say anything about my mom just say you're visiting heather if they ask." (errors in original).

Schaefer arrived in Bali just after midnight on August 12, 2014. Soon after, Mack and Schaefer met at the hotel. Much of Mack's and Schaefer's movements through the hotel were captured by the hotel cameras. They can be seen heading through the lobby, on the third and sixth floors, inside the elevators and in the hallways.

Witnesses from the hotel are expected to testify that in the early morning hours of August 12, 2014, Von Wiese went to the hotel lobby seeking assistance locating her daughter after Von Wiese had woken to find that Mack was not in her hotel room. Hotel staff notified Von Wiese that Schaefer had checked into a room under Mack's name, and that the charges for the room were to Von Wiese' account. Moments later, as seen on hotel camera footage, Mack appeared in the lobby and was confronted by Von Wiese, who was visibly angry. According to witnesses, Mack tried to coax her mother back to the room and was heard by the hotel staff saying that Schaefer was in Bali for a school trip, which was untrue.

As described above, Mack reserved a separate room in Mack's name and provided careful instructions to Schaefer about what to do (and not do) when he arrived at the hotel. This evidence suggests that Mack and Schaefer were attempting to conceal Schaefer's presence in Bali from Von Wiese. Once Schaefer and Mack realized Von Wiese had learned from hotel staff that Schaefer was at the hotel in a room billed to Von Wiese' account without authorization, and only a few weeks after Schaefer and Mack had been arrested for charging hotel stays in Chicago to Von Wiese' credit card, the risk to Mack and Schaefer of Von Wiese again pursing criminal charges against Mack and Schaefer for theft of her funds only escalated. In fact, a hotel employee overheard Von Wiese tell Mack that she and Schaefer would face prosecution in Chicago for credit card fraud. This is also corroborated by Mack's text messages to Schaefer in the hours leading up to the murder that it was "dangerous to not do it," referring to the murder and, "shell [she will – Von Wiese] figure a lot out eventually." This evidence establishes that, as a result of Von Wiese learning of Schaefer's arrival, Mack and Schaefer were concerned that Von Wiese would figure out the murder plot and that she would also file charges for the fraud. The text messages communications reflect their urgent need to put their plan to kill Von Wiese into action as soon as possible. In fact, they killed Von Wiese hours later on the same day.

After returning to her hotel room, Von Wiese called the front desk and requested a wakeup call for "10:30 a.m.," in "four hours." Based on the timing of the request, it is believed that Von Wiese contacted the front desk at approximately 6:30 a.m. As those hours passed, text messages between Mack and Schaefer, and between Schaefer and his cousin Bibbs show how Mack and Schaefer waited impatiently for Von Wiese to fall back asleep and plotted ways to kill her.

**J.  Mack and Schaefer Texted About How to Kill Von Wiese the Day of the Murder**

Schaefer arrived in Bali just after midnight on August 12, 2014, and Von Wiese was dead later that day.  In the hours leading up to Von Weise's death, Schaefer and Mack exchanged text messages indicating they were waiting for the right moment to murder Von Wiese.  The messages reflect that Mack and Schaefer were waiting for Von Wiese to fall asleep and that the plan was to strike her in the head, suffocate her, or otherwise knock her out.  The text messages reveal, in chilling detail, the back and forth between Mack and Schaefer as they waited for the right moment to murder Von Wiese.  Some of these text message included:[4]

| | |
|---|---|
| Schaefer: | wait till it's a heavy snore. |
| Mack: | literally cant wait. |
| Mack: | I'm so scared not to do it. |
| Schaefer: | don't rush. |
| Schaefer: | cant we sfcate [suffocate] her together … put your hand over her moutg [mouth]. |
| Schaefer: | let me just creep up and wack her … once I do it she was drunk and slipped and fell. |
| Mack: | okay |
| Mack: | just knock her out. |
| Schaefer: | … get her [Von Wiese] weak |
| Schaefer: | I promise you heather … Relax … Ur Bonnie do it [you're Bonnie, in reference to Bonnie and Clyde]. |
| Mack: | … I need you in here too. |
| Schaefer: | can you wack her in the head with a big ass pole … trust me [w]e got nothin to lose right now. |
| Mack: | i need your help … just put your hand over her and i could grab her body. |
| Schaefer: | [f]uck … must knock her out … I'm finding something right now … I'll do it. |
| Mack: | [o]kay. |

Schaefer then sent Mack a photo of a metal fruit bowl handle from the hotel room. The texts continued:

---

[4] Excerpts from the exchange between Mack and Schaefer before Von Wiese' murder are provided. Not all of the text messages in this conversation are listed.

| Schaefer: | come in the hallway right now … I'm gonna slow af [as fuck] and do it. |
| Mack: | slow [] quiet. |
| Mack: | too dangerous to not do it … you have to come in …. |
| Mack: | just do what you can ill need you[r] help ... dont let her yell … [g]ive her a minute to be off guard. |
| Schaefer: | let me hit her first. |

In these and related messages, Mack and Schaefer discussed the plan to murder Von Wiese in detail.

### K.  Schaefer Texted Bibbs About the Murder

Around the same time Schaefer and Mack were texting about the imminent murder, Schaefer was also texting with Bibbs. During these messages, Bibbs provided advice to Schaefer via text message on alternative ways to kill Von Wiese, such as drowning her, and how to conceal the murder, such as by avoiding cameras.

Schaefer sent Bibbs a message stating, in part, "you wouldn't believe … shawty (sic) rose … definitely need that [gun emoji] … she [Mack] wants me to right now while she [Von Wiese is] snoozing," which Bibbs understood to mean that Mack asked Schaefer to help her kill Von Wiese while Von Wiese was asleep. It is believed that "shawty [shorty] rose" is a reference to Von Wiese waking in the middle of the night, when she discovered Mack had booked a hotel room at the hotel for Schaefer.

Bibbs sent a response to Schaefer, stating, "Go sit on her face wit (sic) a pillow then," by which Bibbs meant that Schaefer should go and suffocate Von Wiese. Schaefer then sent a series of messages to Bibbs, asking in part, "What would you do?" Bibbs replied "If it's no cameras then," followed by an emoji indicating "okay," by which Bibbs meant that Schaefer should carry out the murder as long as no cameras were present, to mitigate the risk of being observed.

Bibbs is expected to testify that he counseled Schaefer to be careful, and sent messages intended to encourage Schaefer to kill Von Wiese. Bibbs sent Schaefer these messages because Bibbs believed that Schaefer and Mack planned to kill Von Wiese. Bibbs offered his advice to Schaefer to reduce the likelihood of Mack and Schaefer being caught and prosecuted. Bibbs also believed that Schaefer would become wealthy as a result of Von Wiese' murder, and that Schaefer might share some of the proceeds with Bibbs.

Together these communications include discussions of how to accomplish and conceal the goals of the conspiracy, namely, the murder of Von Wiese, and underscore a primary motive of the conspiracy, which was to acquire Von Wiese' money through her death.

### L. Mack and Schaefer Murdered Von Wiese, Placed Her Body in a Suitcase, and Removed Evidence of the Murder from Von Wiese' Hotel Room.

Shortly after the messages above were sent, Von Wiese was severely beaten. According to an autopsy performed in Indonesia, and corroborated by a second autopsy performed in the United States by the Armed Forces Medical Examiner, Von Wiese died from blunt force trauma to the head and face. The injuries included fractured nasal bones that obstructed Von Wiese' airway. The autopsy revealed signs of asphyxiation. The autopsy also revealed defensive wounds to Von Wiese' arms.

After the murder, Mack and Schaefer forced Von Wiese' body inside a suitcase. This would have been difficult to accomplish because Von Wiese was approximately 5'8 inches tall and weighed approximately 162 pounds. Mack and Schaefer wrapped the suitcase with tape and bed sheets. To conceal the gruesome scene, they took the bed sheets from Schaefer's room and swapped out the bloody bedsheets from Von Wiese' bed. Mack and Schaefer then stuffed many of the bloody sheets and pillows into various suitcases and even concealed some inside a laundry bag which they placed inside a fire extinguisher closet located in the hallway.

After the murder, at approximately 10:04 a.m., Schaefer messaged Bibbs, "Lord forgive me ... Our father B [blood] everywhere Need yo help bro … for some reason I don't feel bad." Bibbs responded, "… there wasn't any positive energy released from her body." The hotel camera footage shows Mack retrieving a luggage trolley from the first floor and taking it to the third floor.

At approximately 10:30 a.m., after Schaefer and Mack murdered Von Wiese, hotel staff placed a wakeup call to Von Wiese' room, which was recorded. Mack answered the telephone and calmly thanked the staff for the wakeup call. When the hotel staff asked if Mack wanted "coffee or tea," Mack politely declined and noted that "we're going down to breakfast …."

### M. Mack and Schaefer Attempted to Flee

After the murder, Mack and Schaefer walked out of the hotel with a luggage trolly containing their belongings and the suitcase containing Von Wiese' body. They walked to a driveway area and tried to hire a taxi. The hotel staff and taxi driver sensed that something was not right. The taxi driver was so concerned about the situation that he used his cellular telephone to record what was happening. On the recording, one of the hotel staff can be heard asking if that was "blood," referring to the bed sheet wrapped around the suitcase. The video captured Mack and Schaefer adjusting the suitcase containing Von Wiese' body inside the trunk of the taxi.

The taxi driver refused the fare and money that Schaefer offered, and Schaefer and Mack walked away, leaving the suitcase with Von Wiese' body in the trunk of the taxi. Incredibly, as Mack is walking away from the area, Mack can be heard on video telling the hotel staff, in an angry tone, that she was "going to be right back" and "I'm going to call my mother!" It is believed that Mack's statements about contacting her mother, who she and Schaefer had just killed, were designed to temporarily allay the hotel staff's suspicions, while giving her and Schaefer time to escape from the hotel. Hotel camera footage shows Mack and Schaefer leaving the hotel grounds.

26

The local police arrived and eventually Von Wiese' body was located and taken to the hospital for autopsy.

Evidence indicates that, after killing Von Wiese at the St. Regis Hotel, Mack and Schaefer left the St. Regis Hotel, traveled to the airport and then to the Risata Hotel near the airport, where they were arrested the next day. Text communications between Mack and Schaefer from August 12, 2014, corroborate these movements because they contain communications in which Mack and Schaefer disagreed over whether they should speak with immigration officials. Mack checked into the Risata Hotel using the false name "Hannah Mackenzie." Mack claimed she had been robbed the previous night and did not have identification.

The same day, Mack laid the groundwork for a possible explanation of how her mother was murdered. Mack called the doorman at the building where she and Von Wiese lived in Chicago and said that she and Von Wiese were being held hostage, that Von Wiese was arguing with the kidnappers, and asked if any "weird" people had come around the building in Chicago. Mack also contacted a family friend and told them that Von Wiese had been kidnapped and asked for advice about what to do. This family friend apparently believed Mack and contacted the U.S. consulate and a friend of Von Wiese to report the disturbing information.

Local media reported the murder of Von Wiese and included Schaefer's name in the reporting. A vigilant Risata Hotel employee recognized Schaefer's name and contacted the police. On the morning of August 13, 2014, the day after the murder, police arrested Mack and Schaefer at the Risata Hotel. After the arrest, the police recovered cell phones used by Mack and Schaefer (containing the text messages between them as described above) from the hotel room where Mack and Schaefer were staying. Additionally, among other items, police recovered handwritten notes that appeared to be details of the false kidnapping story. In an interview with local police, Mack,

again, claimed that Von Wiese had been kidnapped. It was not until subsequent interviews that she abandoned that claim. Later versions of her account claimed that Schaefer killed Von Wiese after Von Wiese tried to attack him. As described below, however, in a surreptitiously recorded interview, Mack later admitted that she participated in her mother's murder.

### N. Mack Admitted the Conspiracy and the Murder

Mack and Schaefer were arrested by Indonesian police on August 13, 2014, and charged in connection with the murder of Von Wiese. While Mack was in Indonesia awaiting trial, she was contacted by Schaefer's relative, K.W, who, unbeknownst to Mack, recorded one of the conversations she had with Mack (and not at the prompting of law enforcement, which only later learned of the recording), including the excerpts of the conversion below[5]:

> KW: So anyway, I, I wanted to uh Skype call you because I can't talk to you on my phone and I can't talk to anyone um, about, about anything except for you […]I have to take everything I know to my grave. Literally.
>
> Mack: I know.
>
> KW: […] And this means that you two can't say anything either.
>
> Mack: No, yeah. We haven't to anyone but you.
>
> KW: You promise?
>
> Mack: Yeah, I promise. I swear […] Nobody knows. The entire world know that the truth that the truth, truth, that, that the world knows. Nobody knows what you know.
>
> […]
>
> KW: And, um, I'm trying to understand like, like, I, I'm, I'm about forgiveness for you and him. You and Tommy [Schaefer]. Okay? […] I'm trying to understand […]
>
> Mack: No, it's hard. It's uh, it's a hard concept to grasp […] [a]nd not look at me differently.
>
> KW: Yeah, well both of you, not just you.
>
> Mack: Well yeah, but me. It was my mother.
>
> KW: Yeah, but let, let me ask you. When, when Tommy hit her with the bowl why didn't you, why didn't you just go to the receptionist [at the hotel]. Why'd you have to cover her mouth? […] Why did you have to put your

---

[5] Portions of the recording were previously provided to the Court in advance of a hearing on defendant's motion for bond, and the complete recording has been tendered to defense counsel in discovery.

hand over her mouth? Why couldn't you go to the receptionist? And just call the ambulance or something?

Mack: She, I didn't, at that point she was dead. Well my mother was also to the point where the only reason why we really didn't get in trouble for that hotel thing is because I was involved in it. And she would not have gotten me arrested. If it was just Tommy she would have fought for years to get him that felony charge. The fact that I was in prison and I refused to leave was what got him released with no charge. So if I, at that point, when she, when, when he hit her and she, she didn't even really scream she just kind of grabbed him at that point. She would not have included me in that and it wouldn't have mat…he would have been in such deep trouble and she would not have, I just, I was afraid for him and I was afraid for me and I just at that point we were in such trouble that I didn't, I just wanted the trouble to stop. I didn't, I…

KW: And the only way…

Mack: I didn't even want, I didn't even want to go to the reception desk at all.

KW: So basically she [Von Wiese] had to die, otherwise both of you would have gotten into other…

Mack: […] Tommy would have gotten in to such trouble. […] So he would have been here for just as long if not longer especially with her [Von Wiese] testifying and going all over the world saying Tommy did this to me and Tommy did that. I just, I just wanted it over […] I didn't even cry until we got to the, the other hotel [the Risata, where Mack and Schaefer were arrested]. Until we until we packed cleaned everything up [Von Wiese' body, the bloody sheets, and the suitcase], ran from everybody [left the St. Regis], got caught, ran, got in a taxi went to the airport, got in another taxi went to the hotel [the Risata]. […]

[…]

KW: Well you know Tommy loves you, right? […] And he's willing to, he's willing to accept the blame completely basically.

Mack: I know. And I hate that. But if the real the actual story came out both of us would be here forever, Like if we said the actual story with my involvement and with everything, not yeah both of us would be here forever there's nothing either of us could do to help each other I know it's hard though for him to have the whole world thinking that he did it Because it wasn't like that. He would never have done it if well you know if I hadn't of put him in this situation. He would not have done it, it was not his battle […]It was my fight and I just couldn't handle it by myself and I shouldn't have involved him.

KW: And, you're for sure that if you hadn't covered her mouth that he would be in more trouble?

Mack: Oh yes. If I, if she hadn't died I don't know how long he would've been here for […] he would have been the only reason he was wasn't he didn't have a felony credit card theft charge was because I was the one who stole the credit card and I told my mother on the phone when I was in prison if you don't admit that you knew where I was then I'm going to go into court

and say I was the one who took it. And I'm going to say Tommy had nothing to do with it and he'll walk out and then you'll have to pay for my lawyer. And then she was like well there's nothing I can do and then she dropped it. Because I threw myself in front of him because I knew she wouldn't hurt me. […] it was either me or her, like I couldn't keep fighting how she made me feel. And like the mental state that she put me in […] I just couldn't fight anymore. It was going to be one or one of one or the other it was like survival […]

Several statements in this recorded conversation corroborate communications between Mack and Schaefer described above, namely, that Mack and Schaefer jointly participated in the killing of Von Wiese. During the recorded conversation with K.W., Mack made admissions related to the conspiracy and murder. For example, at one point, K.W. asked Mack why Mack covered Von Wiese' mouth after Schaefer hit Von Wiese with the "[fruit] bowl." As described above, shortly before the murder, Schaefer texted Mack a photo of the metal handle portion of a fruit bowl from his hotel room as they discussed how to kill Von Wiese. As described above, Schaefer and Mack also discussed who would cover Von Wiese' mouth.

Mack told K.W., a relative of Schaefer, that Von Wiese had to die because Schaefer would have been in even bigger trouble if Von Wiese survived. As noted above, after Von Wiese discovered that Schaefer was in Bali, Mack sent text messages to Schaefer noting that it was "dangerous to not [kill Von Wiese] and also stated that "she['ll figure a lot out eventually … she could draw soo (sic) much attention to us …." These communications all establish that one motive that Mack and Schaefer had for killing Von Wiese was to prevent her from pressing criminal charges against them.

During the recorded call, K.W. further commented that Schaefer loved Mack and was ostensibly taking responsibility for the murder. Mack commented that she "hate[d] that," but emphasized that "if the real, actual story came out both of us would be here [in the Bali prison] forever. Like if we said the actual story with my involvement and with everything… He would

30

never have done it if, well you know, if I hadn't of put him in this situation." This refers to Mack and Schaefer's extensive premeditation and planning related to Von Wiese' murder. This establishes that neither Mack nor Schaefer killed Von Wiese spontaneously or of their own accord, but acted together out of common motivations.

### III.  STATEMENTS MADE DURING AND IN FURTHERANCE OF THE CONSPIRACY

The statements between and by the coconspirators made in furtherance of the conspiracy that the government intends to offer at trial fall into several categories, all concerning subjects that were integral to the conspiracy and its success. These categories of statements are described in more detail below. Some statements fall into multiple categories.

The government is not detailing each and every proposed coconspirator statement of each witness or document but rather a representative sample of the statements from each witness and/or document. Further, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

The Government has previously disclosed to defendant: texts between Mack and Schaefer from Mack's phone at Bates number Media 36;  texts between Mack and Schaefer recovered from Schaefer's phone at Bates number Media 01; Facebook messages between Mack and Schaefer at Bates number FBI302_001-006477; Facebook messages between Schaefer and M.M. at Bates numberFBI302_001-004385; communications between Schaefer and M.S. at Bates number FBI302_001-000687; and communications between Schaefer and Bibbs at Bates number Media 2 (several of these communications are also quoted in Bibbs' publicly available plea agreement).

### A. Statements Made to Further the Scheme

#### 1. Statements Regarding the Travel Logistics of the Scheme (Travel Arrangements, Provisions, Hotel Room and Passport)

Mack and Schaefer's many text message conversations discussing status updates and challenges getting to Bali contain admissible coconspirator statements. Traveling to Bali was an integral part of the planning involved in the conspiracy to murder Von Wiese in Indonesia.  These statements include:

- conversations about Schaefer's passport application, delays in getting the passport, conversations about when he is going to get the passport, and increasingly urgent and frustrated communications between Mack and Schaefer about when he will be able to travel due to the delay in getting the passport and Schaefer's efforts to get the passport expedited;

- conversations between Mack and Schaefer about what flight Schaefer will be on, when the flight will take off, how to get through the airport, and how Mack is arranging the flight through hotel staff and complications that arise in that process;

- conversations about the hotel room that Mack booked for Schaefer for one night at the St. Regis hotel using Von Wiese' credit card; and

- status updates between Mack and Schaefer regarding their respective trips, such as when they are in the airport lounge, about to board, and similar statements.

Additionally, Schaefer arranged to travel to Bali by getting cash for the trip and for his visa, by communicating with his former roommate. Although M.S. is not part of the joint venture to kill Von Wiese, Schaefer's statements are intended to prompt M.S. to act in a manner that facilitates the carrying out of the conspiracy, namely, by providing Schaefer the money Schaefer needed to buy food for the trip to Bali and a visa at the airport once he arrived.  Therefore, admissible coconspirator statements include:

- Schaefer's request to M.S. for $200 that day so that Schaefer could travel internationally and statements Schaefer would forgive the balance of what he was owed; and

32

- Statements that give context to the above, namely, conversations between Schaefer and M.S. regarding the money M.S. and another former roommate owed Schaefer and Schaefer's prior efforts to obtain the money, including stating he would contact the police.

These logistical discussions include updates on the conspiracy and the essential step of getting Mack and Schaefer physically to Bali to kill Von Wiese. Additionally, Schaefer's willingness to forgive a debt he had sought for two months to recover, along with statements he would not need the money after the trip because he would have "enough," are admissible statements related to one of the purposes of the conspiracy – to benefit financially from Von Wiese' death.

### 2. Statements by Schaefer Assuring Mack He Can Be Trusted to Perform His Role and Describing the Status of their Relationship

On multiple occasions close in time to when Mack traveled to Bali, Schaefer assured her that he would prove a capable partner in Von Wiese' murder. Admissible statements include:

- Schaefer's multiple texts to Mack saying he loved her, would do anything for her, and encouraging Mack, "use me" for her ends, and Mack's encouraging responses to those statements to provide context; and

- Schaefer's statements about the status of his relationship with Mack, which was integral to accomplishing the object of the conspiracy and a motive for his participation in the conspiracy.

### 3. Statements Describing the Purpose of the Conspiracy

Mack and Schaefer communicated about their purposes in killing Von Wiese, namely, financial motives, fear Von Wiese would press criminal charges against them, and general hatred of Von Wiese. Admissible statements describing the purposes of the conspiracies include:

- Statements by Schaefer indicating the purpose of the conspiracy was to obtain money and statements regarding the fact he expected to have wealth after the trip (including, as examples, Schaefer's texts to Mack indicating he was thinking about "lavish lifestyles," communications with Bibbs containing gun emoji and dollar signs and referencing trips to Italy and other perks, communications with M.S. about having

"enough" when he returned from his international trip that he would forgive the balance of what M.S. and Schaefer's other former roommate owed Schaefer);

- Statements by Schaefer reflecting his and Mack's history of stealing money from Von Wiese, and expected consequences. This includes statements by Schaefer indicating Schaefer and Mack feared that, if Von Wiese lived, they would get in legal trouble. (For example, on the day of the murder, Mack texted Schaefer, "I'm scared not to do it," and Schaefer responded soon after, "we have option 1, that will work….I can't go to jail.");

- Statements by Schaefer regarding Mack's hatred of Von Wiese;

- Statements by Schaefer that Mack wanted to kill her mother because they had a bad relationship, such as Schaefer's statement to M.M. in February 2014, "please do not repeat this to anyone Heather does not deserve to have anything else bad happening to her[,]but she said that the one thing that would make her most happy is if her mom dies … [s]he asked me to find someone to kill her mom for 50k … [] she hates her mom so much … [a]nd can't wait to see her mom die"; and

- Schaefer's statements to M.S. indicating Schaefer was willing to forgive a debt because he would have "enough" after he returned from his trip.

All of these statements, especially when combined with other trial evidence, are probative of Mack's and Schaefer's participation in the charged conspiracies and their reasons for wanting to accomplish the murder, namely to kill Von Wiese, take her money, and avoid accountability.

### 4. Statements Describing the Method of the Conspiracy and How to Kill Von Wiese

Statements made by Mack and Schaefer in the weeks and hours leading up to the murder, coupled with their frequent use of text messages to communicate, demonstrate, in real time, the existence of the charged conspiracies and their progression toward completion. These communications are voluminous. As described above, these statements include:

- Schaefer's statements regarding the status of Schaefer's travel documents, hotel reservation, passport, and spending money for the trip;

- statements by Schaefer evincing the excitement Schaefer experienced in the moments leading up to the murder, suggesting it was pre-planned rather than the product of a heat of the moment fight that got out of hand;

- Schaefer and Bibb's statements discussing the status of the conspiracies, for example, Schaefer's statements to Bibbs that Von Wiese awoke ("shawty rose"); that Mack was asking Schaefer to come to her and Von Wiese' hotel room to kill Von Wiese ("she [Mack] wants me to right now while she [Von Wiese] is snoozing"), among others;

- Statements between Schaefer and Bibbs, in which Schaefer seeks advice and reassurance from Bibbs about how to kill Von Wiese (including discussion of drowning or using a weapon) and avoid detection (prompting Bibbs' comment about "no cameras");

- Statements by Schaefer providing Bibbs updates on the status of the conspiracy, such as informing Bibbs that Mack had summoned Schaefer to Mack's room to commit the murder and that Schaefer and Mack were waiting for Von Wiese to fall asleep; and

- Statements by Schaefer to Mack leading up to Von Wiese' death in which they discuss waiting for Von Wiese to fall asleep and how they would physically harm her (hit her with a big pole, suffocate her, etc.).

These stark, detailed statements by Schaefer to Mack and to Bibbs, are highly probative of how Mack and Schaefer worked together to plan and accomplish the murder. Further, Schaefer's statements to Bibbs, M.S., and M.M. indicate how the conspiracy was accomplished, namely, that Mack offered money to Schaefer for help killing her mother, and also one of the purposes of the conspiracy, namely, that Schaefer expected he would receive the money and share it with his family and forgive a debt to M.S.

### 5. Statements Providing Status Updates After the Murder

Schaefer's statements informing and updating Bibbs about the current state of the conspiracy's progress are admissible, including:

- Schaefer's statements to Bibbs after the murder provided updates to Bibbs, namely that the murder occurred ("Lord forgive me ... Our father B [blood] everywhere Need yo help bro … for some reason I don't feel bad.")

Additionally Bibb's statements in response, such as the statement regarding there being no "positive energy released from her [Von Wiese'] body," provides context for Schaefer's statements and indicate Bibbs and Schaefer were talking about the murder.

## III. CONCLUSION

The above is an outline of the evidence that the government will introduce to establish that the charged conspiracy existed and that the defendants were members of the conspiracy. The Court should find, based upon this proffer, that coconspirator statements are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

KENNETH A. POLITE, JR.
Assistant Attorney General
Criminal Division

By: */s/ Ann Marie E. Ursini*
ANN MARIE E. URSINI
Assistant United States Attorney
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604

By: */s/ Frank G. Rangoussis*
FRANK G. RANGOUSSIS
Senior Trial Attorney
Human Rights and Special
Prosecutions Section
1301 New York Ave., N.W., Rm. 1215
Washington, D.C. 20530